UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MICHELLE CAMPBELL, Individually, and as surviving spouse of James Richard Campbell, Jr., deceased,<br><br>      Plaintiff,<br><br>v.<br><br>LAKE REGIONAL MEDICAL MANAGEMENT, INC., d/b/a Lake Regional Medical Urgent Care – Eldon, RENE REVELLE, KANDI PADGETT, JOHN AND JANE DOES #1-10, LAKE REGIONAL HEALTH SYSTEM, and LAKE REGIONAL ALLIED SERVICES,<br><br>      Defendants. | Case No. 2:19-cv-04124-NKL |

**ORDER**

Before the Court is Plaintiff Michelle Campbell's motion for partial summary judgment on Defendants' affirmative defense of comparative fault. Doc. 114. For the reasons stated below, Plaintiff's motion is granted.

## I.  BACKGROUND[1]

On the morning of June 24, 2016, fifty-eight-year-old Mr. James Campbell, Jr., visited the Lake Regional Medical Care – Eldon complaining of shortness of breath, dizziness, and occasional cough with clear, thick mucus lasting for two days prior. Doc. 115-1 (Campbell Appointment Record). At the clinic, Mr. Campbell was seen and treated by Nurse Rene Revelle, CNP, and

---

[1] All facts are viewed in the light most favorable to the nonmoving party. *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971 (8th Cir. 2019).

1

Nurse Kandi Padgett, LPN, who recorded in his appointment record that he had been sanding concrete two days prior without a mask. *Id.* They also recorded that he was currently on blood pressure medication, had a history of hypertension, weighed 305 pounds, was a current smoker, and had a heart rate of 115. *Id.* Mr. Campbell was diagnosed with bronchitis, wheezing, and decreased breath sounds at his right lung base. *Id.* Nurse Revelle prescribed an intramuscular injection of Depo-Medrol as well as a Levalbuterol nebulizer breathing treatment, both of which were administered by Nurse Padgett at the clinic. *Id.* After the breathing treatment, Mr. Campbell's heart rate increased to 116 beats per minute. *Id.* Mr. Campbell was instructed to use the Levalbuterol breathing treatment every six to eight hours starting at 3:30 PM. *Id.* Doc. 117, p. 9. Later that morning, Mr. Campbell was discharged and told to go to the ER immediately for further evaluation if he became increasingly short of breath, if he experienced heart palpitations, or if his heart rate became fast or felt as if it was racing. Doc. 115-1. Nurse Revelle testified that Mr. Campbell was a cooperative patient and that she did not recall him failing to do anything she asked him to do. Doc. 115-3 (Nurse Revelle Deposition), p. 103.

At 3:30 PM, and again at around 9:00 PM, Mr. Campbell used the Levalbuterol breathing treatment as instructed. Doc. 115-10 (Michelle Campbell Deposition), p. 41; Doc. 115-12 (Kurt Gowdy Deposition), p. 22. Mr. Campbell's wife and visiting family friends observed that throughout the evening, Mr. Campbell did not appear in distress and spent the evening on the couch with his feet up. Doc. 115-10, p. 46; Doc. 115-11 (Jim French Deposition), pp. 10, 16; Doc. 115-12, p. 14. However, later that evening, Mr. Campbell's wife and friends found him on the floor and called emergency services. Doc. 115-11, pp. 13–14. Mr. Campbell was pronounced dead shortly after midnight. Doc. 115-13. Plaintiff and Defendants disagree about the cause of death.

2

Mr. Campbell's surviving spouse Michelle Campbell brings this suit, alleging in part that Nurse Revelle breached the standard of care by failing to recognize that Mr. Campbell had symptoms and risk factors of acute coronary syndrome and that Defendants could not rule out an acute myocardial infarction. Further, Plaintiff contends that based on Mr. Campbell's presentation at the clinic, Defendants failed to send him to the emergency room for appropriate diagnostics and treatment of acute coronary syndrome. Plaintiff contends that Mr. Campbell died of arteriosclerotic heart disease leading to acute myocardial infarction.

Defendants deny these allegations and contend that the actual cause of his death was respiratory arrest leading to cardiac arrhythmia resulting from decreased oxygen supply due to Mr. Campbell's new onset pulmonary pathology combined with hypertension, on top of preexisting emphysema and prominent smoker's bronchiolitis. Doc. 117, p. 2. Mr. Campbell's cardiac arrythmia, Defendants assert, then led to a type II myocardial infarction. *Id*. at p. 14. Defendants contend that Mr. Campbell "presented with a lung condition and was treated for that condition. Decedent's preexisting medical condition and his lifestyle choices for many years contributed to his lung condition and his ultimate cause of death, which is submissible to a jury." *Id*. at p. 3.

## II. LEGAL STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material

fact for trial," *Thomas v. Corwin*, 483 F.3d 516, 526 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

Plaintiff moves for partial summary judgment on Defendants' affirmative defense of comparative fault, contending that (1) Missouri law does not permit Defendants to assert comparative fault for the condition which caused Mr. Campbell to seek medical treatment and (2) even if Defendants could assert this affirmative defense, there is no evidentiary support in the record for Defendants' comparative fault allegations. Defendants respond that "Decedent's preexisting medical condition and his lifestyle choices for many years contributed to his lung condition and his ultimate cause of death, which is submissible to a jury." Doc. 117, p. 3.

Missouri law controls the substantive issues in this diversity action and the Court is bound by the decisions of the Supreme Court of Missouri. *United Fire & Cas. Co. v. Titan Contractors Serv., Inc.*, 751 F.3d 880, 883 (8th Cir. 2014). "If the Supreme Court of Missouri has not addressed an issue, [the Court] must predict how the [the Supreme Court of Missouri] would rule, and [the Court will] follow decisions from the intermediate state courts when they are the best evidence of Missouri law." *Id*.

In 1983, Missouri adopted the system of pure comparative fault in tort actions, meaning "a plaintiff's negligence that concurs with that of the defendant does not relieve the defendant from liability. It merely diminishes the amount of damages that the plaintiff can recover." *Allison v. Sverdrup & Parcel & Assocs., Inc.*, 738 S.W.2d 440, 451 (Mo. Ct. App. 1987). "Comparative fault is an affirmative defense in which the defendant must prove that the actions or omissions of

4

the plaintiff contributed to the plaintiff's loss to negate or reduce the defendant's legal responsibility." *Magill v. United States*, No. 4:05CV547MLM, 2006 WL 1153810, at *4 (E.D. Mo. May 1, 2006).

When it comes to medical malpractice actions, "[c]ourts have been reluctant to impose joint liability upon a patient in a malpractice lawsuit for the condition which caused him to seek the physician's assistance, even if the patient negligently imposed the condition upon himself." *Van Vacter v. Hierholzer*, 865 S.W.2d 355, 358–59 (Mo. Ct. App. 1993) (citing *Owens v. Stokoe*, 140 Ill. App. 3d 355, 92 Ill. Dec. 726, 485 N.E.2d 537 (1985); *Lamoree v. Binghamton Gen. Hosp.*, 68 Misc. 2d 1051, 329 N.Y.S.2d 85 (S. Ct. 1972); *Matthews v. Williford*, 318 So. 2d 480 (Fla. App. 1975); *Whitehead v. Linkous*, 404 So. 2d 377 (Fla. App. 1981); *Cheek v. Domingo*, 628 F. Supp. 149 (D.V.I. 1986)). *See also Harb v. City of Bakersfield*, 233 Cal. App. 4th 606, 633, 183 Cal. Rptr. 3d 59, 80 (2015) ("Based on the reasoning set forth in the cases from other jurisdictions, the secondary authorities, and California's adoption of the basic principle of tort law that a 'tortfeasor takes the plaintiff as he finds him', we conclude the majority rule should be applied in California" and "a plaintiff's comparative fault should not be presented to the jury when the plaintiff's allegedly negligent conduct occurred before the first responders arrived at the scene of the accident."); *Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 509, 244 P.3d 835, 843 (2010) ("[G]iven that the focus in medical malpractice claims is on the negligent acts or omissions of the medical provider, it is inappropriate to use the patient's negligence that led to the condition that required medical attention to excuse the defendants' failure to meet the accepted standard of care. A patient who negligently injures himself is nevertheless entitled to subsequent nonnegligent medical treatment, and, if it is not provided, the patient is entitled to recover damages for the consequences of that negligence."); *Zak v. Riffel*, 34 Kan. App. 2d 93, 105, 115 P.3d 165,

5

174 (2005) ("[A]n assertion of fault based only upon Michael's 'obesity and lifestyle' would be legally deficient because that is what required Michael to seek medical care in the first place."); *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 128 (Tenn. 2004) ("[M]ost jurisdictions have held that a patient's negligence that provides only the occasion for medical treatment may not be compared to that of a negligent physician." (listing cases)); *Wolbers v. The Finley Hosp.*, 673 N.W.2d 728, 733 (Iowa 2003) ("While it seems clear that smoking can produce increased secretions, such as the ones that caused a blockage to the airways of plaintiff's decedent, it seems equally clear that the present claim was based on the hospital staff's alleged failure to adequately treat the condition that existed, whatever its cause. Under the court's instructions, the jury was required to so find in order to allow recovery . . . The district court correctly declined to give a jury instruction on comparative negligence." ); *DeMoss v. Hamilton*, 644 N.W.2d 302, 307 (Iowa 2002) ("Any 'fault' on Brian's part for conduct contributing to his heart attack is simply irrelevant to the question of medical negligence underlying DeMoss's cause of action. Only if Hamilton were found at fault for alleged misdiagnosis or treatment would Brian's state of health become potentially relevant to the remaining questions of proximate cause, lost chance of survival and life expectancy. And on those questions, whether his state of health resulted from poor lifestyle choices or bad genes would make no difference.); *Rowe v. Sisters of Pallottine Missionary Soc'y*, 211 W. Va. 16, 22, 560 S.E.2d 491, 497 (2001) ("Plaintiffs who negligently injure themselves are entitled to subsequent, non-negligent medical treatment. If a health care provider renders negligent medical treatment, regardless of the event that triggered the need for medical treatment, plaintiffs are entitled to an undiminished recovery in a tort action for any damages proximately caused by that negligent medical treatment."); *Harding v. Deiss*, 2000 MT 169, ¶ 16, 300 Mont. 312, 318, 3 P.3d 1286, 1289 ("[C]omparative negligence as a defense does not apply where a patient's pre-treatment

behavior merely furnishes the need for care or treatment which later becomes the subject of a malpractice claim. The patient's conduct before seeking medical treatment is merely a factor the physician should consider in treating the patient."); *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 15, 459 N.W.2d 178, 187 (1990) ("Although Larry's failure to lose weight may have been causally related to his pulmonary embolism, Larry's conduct concerning his weight problem merely furnished an occasion or condition for the medical care which is the basis of the malpractice action against Bergan Mercy. Any conduct on Larry's part before he was admitted to Bergan Mercy and which may have causally contributed to his demise was not a proximate cause in reference to alleged malpractice in medical treatment at Bergan Mercy."); Restatement (Third) of Torts: Apportionment Liab. § 7 cmt. m (2000) (reviewing "Plaintiff's negligence when the defendant undertakes to treat or repair a condition caused by the plaintiff's negligence or otherwise to protect the plaintiff from his or her negligence" and noting that in "a case involving negligent rendition of a service, including medical services, a factfinder does not consider any plaintiff's conduct that created the condition the service was employed to remedy.")

In *Van Vacter v. Hierholzer*, 865 S.W.2d 355 (Mo. Ct. App. 1993), Mr. Van Vacter survived a major heart attack in 1982, and the doctors instructed him to quit smoking, to exercise, and to lower his weight and cholesterol. *Van Vacter*, 865 S.W.2d at 356. In 1983, Van Vacter went to the hospital complaining of chest pains, and his treating physician recommended an angioplasty and drug treatment; Van Vacter rejected the angioplasty and did not take the drugs as prescribed. *Id*. Over the following years, Van Vacter did not return for examinations as his doctor requested, but in 1986 again visited a doctor complaining of chest pains. *Id*. at 357. At a follow-up examination, the physician asked Van Vacter to return for a third examination, but Van Vacter

7

did not return, and he quit taking the prescribed drugs as they made him feel uncomfortable and gain weight. *Id.*

In 1987, Van Vacter began experiencing severe chest pains, and at the direction of a health care provider, Van Vacter's wife brought him to the hospital. *Id.* After being examined by the defendant physician, Van Vacter was released, as the doctors concluded his chest pain was spasmodic and had stabilized, but they instructed him to seek immediate medical attention if his pain recurred. *Id.* Although Van Vacter felt pain on his way home, he did not return to the hospital, and his pain continued at home. *Id.* In the early hours of the morning, Van Vacter's wife found him gasping for breath, and he died shortly thereafter. *Id.*

At trial, the jury "heard evidence that Van Vacter's refusal to obey doctors' orders or to cooperate in the treatment of his arterial disease was irresponsible and set him on an irreversible path to his death on March 11, 1987," and the defendant physician argued "that Van Vacter, in effect, committed suicide and, therefore, must share in the fault for his death." *Id.* at 358. The jury was instructed to assess a percentage of fault to Van Vacter if they believed that he "failed to follow the instructions and/or recommendations of his physicians since 1982 with respect to smoking, diet, cholesterol, exercise, medication, balloon angioplasty and/or other medical therapy, or followup," that this was negligent, and that this negligence directly caused or directly contributed to cause his death. *Id.* at 357–58. The jury apportioned 93 percent of the fault to Van Vacter for his own negligence. *Id.* at 357.

The Missouri Court of Appeals reviewed Plaintiff's challenge to the jury instruction, finding that while "the evidence established that Van Vacter had a nonchalant attitude about his health," "[t]he issue is whether this indifference and its consequent inaction was significant as the legal proximate cause of Van Vacter's death—a prerequisite to labeling Van Vacter a joint

tortfeasor who must share in [defendants'] fault." *Id*. at 358. The *Van Vacter* court determined that it was not. *Id*. The *Van Vacter* court reviewed the standard for proximate cause in these cases:

> Proximate cause is the causal connection between the actor's conduct and the resulting injury. To be a proximate cause of an injury, a patient's negligent act must have been simultaneous and cooperative with the defendant's negligent act. It is such cause as operates to produce a particular consequence without the intervention of an independent cause, in the absence of which the injuries would not have been inflicted. Negligent conduct which sets in motion a series of events leading to an injury can be interrupted by an intervening cause which so interrupts the chain of events as to become the responsible, direct, proximate cause of the injury.

*Id*. (internal citations and quotations omitted). The *Van Vacter* court reviewed commentary on proximate cause and observed that "[c]ourts have been reluctant to impose joint liability upon a patient in a malpractice lawsuit for the condition which caused him to seek the physician's assistance, even if the patient negligently imposed the condition upon himself." *Id*. at 358–59. The conduct described in the jury instruction, the court concluded,

> was not a proximate cause of Van Vacter's injury, except to the extent it described Van Vacter's failure to obey [defendants'] treatment instructions on March 10 and 11. Rather, it gave rise to his condition and the occasion for [defendants'] negligence. It was not a basis for the jury to apportion fault to him for any injury caused by [defendants'] negligence.

*Id*. at 359. Thus, the court determined that the instruction "was erroneous because it invited the jury to apportion fault to Van Vacter for his death on the basis of evidence which was not a proximate cause of his death," and remanded the case for a new trial. *Id*. at 360.

The circumstances here are similar. Defendants indicate that their theory is that Mr. Campbell's negligence and pre-existing medical and physical conditions—e.g. Mr. Campbell's alleged "inhalation of particular matter" in conjunction with his "preexisting lung condition from years of smoking"—were the proximate cause of his death. Doc. 117, p. 18. But as in *Van Vacter*, even assuming Mr. Campbell was negligent in these ways, this conduct gave rise to the conditions for which he sought treatment. This conduct was not "simultaneous and cooperative" with

9

Defendants' alleged negligent acts occurring after Mr. Campbell sought treatment. *Van Vacter*, 865 S.W.2d at 358.

Defendants argue that *Van Vacter* does not foreclose the possibility of imposing comparative fault when the patient's condition which caused the patient to seek a physician's assistance is the proximate cause of the injury. "Though not explicitly stated in *Van* [*Vacter*]," Defendants argue, "it follows that a patient's condition can be used as the basis for comparative fault where the patient's injury is the reasonable and probable consequence of a patient's condition and there is no intervening cause of injury." Doc. 117, p. 19. Defendants contend that here, Mr. Campbell's "negligence, conduct, and pre-existing medical and physical condition were the proximate cause of Decedent's injury," *id*. at p. 18, and that "simply seeing a healthcare provider" cannot be determined to be an intervening cause at summary judgment where the cause of death is disputed, *id*. at 19. But as discussed, the *Van Vacter* court held that "[t]o be a proximate cause of an injury, a patient's negligent act must have been simultaneous and cooperative with the defendant's negligent act" and determined that the decedent's failure to follow recommendations regarding smoking, diet, cholesterol, exercise, and medication were not a basis for comparative fault. *Van Vacter*, 865 S.W.2d at 357–59. Defendants do not explain, and the Court does not see, how Mr. Campbell's alleged negligence in smoking cigarettes and sanding concrete without a mask, or his alleged "failure to follow up on health-related issues and his unhealthy lifestyle," were any more "simultaneous and cooperative with" Defendants' alleged negligence here than in *Van Vacter*. Rather, as stated above, these appear to be the conditions and conduct which gave rise to the condition for which Mr. Campbell sought treatment from the clinic.

There are some circumstances in which courts, including Missouri courts, have permitted a patient's fault to form the basis for comparative fault. As stated by the Supreme Court of

10

Case 2:19-cv-04124-NKL   Document 124   Filed 08/14/20   Page 10 of 15

Tennessee, "[a] majority of jurisdictions have allowed a patient's fault to be considered in medical malpractice cases only under very limited circumstances," including allowing juries to apportion fault to "a patient who delays in seeking or returning for medical treatment, who fails to follow a physician's advice or instructions, who furnishes false, incomplete, or misleading information to his or her physician,[2] or who attempts to treat his or her own injury before seeking medical attention." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 129 (Tenn. 2004) (internal citations omitted) (finding that while the decedent's "medical treatment was complicated by his alcohol withdrawal and that evidence concerning his alcohol consumption was clearly relevant to his treatment and to [defendant's] theory of causation," the decedent's "antecedent negligence should not have been considered by the jury in assessing fault.")

Defendants claim that in *Grippe v. Momtazee*, the Missouri Court of Appeals ruled that evidence of a patient's condition could be used as a basis for a comparative fault claim. *See Grippe v. Momtazee*, 705 S.W.2d 551, 555 (Mo. Ct. App. 1986). The *Grippe* court considered conduct that occurred after Defendant's alleged negligence, finding that even assuming there was evidence of the physician's negligence in failing to diagnose a carcinoma at the patient's first visit, there was no error in submitting comparative negligence instruction where the patient failed to follow the physician's instruction to return in six months, even though her breast lump continued to grow and she knew the import of that fact, thereby contributing to the physician's failure to diagnose

---

[2] Defendants' Statement of Additional Uncontroverted Material Facts states that Mr. Campbell did not notify Nurse Revelle or Nurse Padgett that he had diabetes or a family history of heart disease. *See* Doc. 117, p. 15, ¶¶ 1–4. Plaintiff responds that as to Nurse Revelle, there is no documentation indicating whether she asked Mr. Campbell if he had diabetes or took a family history, including whether she asked if there was a family history of heart disease. As to Nurse Padgett, Plaintiff contends that there is no evidence that Nurse Padgett asked Mr. Campbell if he had diabetes and she testified that no family history was taken. Doc. 119, p. 2, ¶¶ 1–4. However, Defendants do not assert this as a basis of Mr. Campbell's comparative fault in their briefing. Therefore, the Court does not consider it.

11

cancer prior to metastasis. *Id.* at 555–56. *See also Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir. 1994) (judgment as a matter of law affirmed because plaintiff's conduct constituted an intervening cause where he ignored medical instructions and failed to seek medical care when he realized he might be having a heart attack); *Love v. Park Lane Med. Ctr.*, 737 S.W.2d 720, 725 (Mo. 1987) (where nurse negligently injected medication but plaintiff failed to consult a physician regarding deteriorating condition of injection site for seven weeks, "[e]xpressing mitigation of damages as a percentage of fault reducing plaintiff's damages is the proper method for fairly accounting for the failure to mitigate as was done in the [jury] instructions."); *Shelton v. United States*, 804 F. Supp. 1147, 1159 (E.D. Mo. 1992) (apportioning fault to plaintiff in medical malpractice action for failure to follow physician's instructions after treatment); *Van Vacter*, 865 S.W.3d at 359 (finding Van Vacter's negligent conduct was not a basis for the jury to apportion fault "except to the extent it described Van Vacter's failure to obey [defendants'] treatment instructions on March 10 and 11."). But Defendants here have not provided any evidence from which a jury could conclude that Mr. Campbell failed to follow Defendants' instructions.[3] Rather, Plaintiff provides evidence that Mr. Campbell was cooperative during the appointment, that he took Defendants' prescribed breathing treatments, and that Nurse Revelle does not recall Mr. Campbell failing to do anything that she asked of him. Therefore this theory of comparative fault is inapplicable here.

---

[3] Defendants state that their alleged negligence, if any, is not "an intervening cause because it was not an independent force which so interrupted the reasonable and probable consequences of Decedent's unhealthy lifestyle and failure to obey and follow treatment instructions." Doc. 117, p. 19. It is unclear what treatment instructions they contend Mr. Campbell failed to follow. Defendants admit that Mr. Campbell used the prescribed breathing treatment as instructed. *Id.* at p. 11, ¶ 31; p. 13, ¶ 36. Defendants' statement of additional uncontroverted material facts does not describe any such instructions. *Id.* at pp. 15–16.

A Missouri Court of Appeals has indicated that a jury could potentially apportion based on a patient's fault where there is evidence that the patient's condition caused or contributed to the cause the patient's death, that the patient recognized that his symptoms were attributed to his condition, and that the patient knew his condition was out of control, yet failed to seek medical attention. In *Gray v. Brock*, the Plaintiffs pursued a wrongful death action against physicians for failure to order a nasogastric tube or tracheostomy for the decedent to prevent aspiration of gastric contents, which the decedent ultimately died of. *Gray v. Brock*, 750 S.W.2d 696, 697 (Mo. Ct. App. 1988). The decedent's physician, also a defendant, had treated the decedent for his diabetes and instructed him that fatality can occur when the blood sugar elevates, evidenced by increased urine output and thirst, eventually leading to a coma. *Id.* at 698. On appeal, the plaintiffs contested the trial court's instructing the jury to find a percentage of fault to the decedent if he knew that his diabetes was "out of control" in the days immediately prior to his hospitalization and yet failed to seek medical attention, causing or contributing to his death. *Id.* at 700. The *Gray* court reviewed the record and found that there was insufficient evidence to support the trial court's instruction, because there was no indication that the decedent knew his symptoms of increased fluid intake and urination were attributable to activation of his diabetes, rather than the flu. *Id.* Thus, a new trial was ordered. However, the *Gray* court also addressed the plaintiffs' argument that including the phrase "diabetes out of control" gave the jury a "roving commission" to speculate as to what facts the jury must find to assess comparative fault. *Id.* The *Gray* court stated that in order to fix this problem,

> [i]f, on retrial, there is evidence that the diabetic condition caused or contributed to cause Mr. Gray's death, and if there is evidence that he actually knew that his increased intake of fluids and frequent urination was attributable to an elevated blood sugar count (as Dr. Brock had advised him), then the facts of increased fluid intake and urination should be incorporated in the instruction on retrial to demonstrate the means of knowledge that the diabetes was out of control.

13

*Id*. Here, while Defendants present evidence that Mr. Campbell's lung condition and inhalation of particles while sanding concrete caused or contributed to his death, there is no evidence that Mr. Campbell knew his symptoms were indicative of a serious or life-threatening condition. Indeed, the *Van Vacter* court distinguished *Gray*, because "the patient in *Gray* was accused of refusing medical treatment only two days before the doctor's alleged negligence although the patient knew his diabetic condition was 'out of control.' Van Vacter failed to promote his own health, but when his symptoms became manifest on March 10, he acted immediately to seek medical treatment." *Van Vacter*, 865 S.W.2d at 359. Here too, even assuming Defendants' arguments that Mr. Campbell's lifestyle had a negative impact on his health are correct, there is no indication that he delayed in seeking medical treatment when his symptoms appeared.

In sum, on the facts, law, and arguments presented here, Mr. Campbell's pre-treatment conduct and his medical conditions as described by Defendants "gave rise to [Mr. Campbell's] condition and the occasion for [Defendants'] negligence," and cannot be the "basis for the jury to apportion fault to [Mr. Campbell] for any injury caused by [Defendants'] negligence" under Missouri law. *Van Vacter*, 865 S.W.2d at 359. Defendants have not pointed to evidence that Mr. Campbell's conduct is analogous to the examples described above wherein a patient's comparative fault is submissible, nor have they cited any law indicating Mr. Campbell's alleged prior conduct or conditions can form the basis for comparative fault in this case. Therefore, Plaintiff's motion for summary judgment on Defendants' affirmative defense of comparative fault is granted.

### a. Cause of Death Evidence

In Defendants' Suggestions in Opposition, they assert that "[e]ven if evidence of Decedent's condition and conduct were not the basis for a comparative fault claim, it does not prevent Defendants from introducing evidence that Decedent's underlying condition, regardless

14

of Defendants' alleged negligence, might, could, or would produce his injury." Doc. 117, p. 21. In response, Plaintiff states that her Motion for Summary Judgment is directed solely at Defendants' affirmative defense of comparative fault, and she "makes no arguments regarding the admissibility of cause of death evidence" and only argues that "the jury should not be allowed to apportion any fault to Mr. Campbell." Doc. 119, p. 9. Therefore, the Court does not consider the admissibility of such evidence. The Court's holding here only concerns Defendants' affirmative defense of comparative fault.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's motion for partial summary judgment on Defendants' affirmative defense of comparative fault is granted.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: August 14, 2020
Jefferson City, Missouri